Thomas BROWN

v.

IVARANS REDERI A/S, Appellant.

No. 76–1037.

United States Court of Appeals,
Third Circuit.

Argued Sept. 8, 1976.

Decided Nov. 4, 1976.

Rehearing Denied Nov. 29, 1976.

Robert B. White, Jr., Rawle & Henderson, Philadelphia, Pa., for appellant.

Avram G. Adler, Adler, Barish, Daniels, Levin & Creskoff, Stanley Paul Kops, Philadelphia, Pa., for appellee.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal by a vessel owner in an action brought by the plaintiff-longshoreman for personal injuries sustained in an

accident aboard the defendant's vessel, the M/V Santos, on August 2, 1974. The trial resulted in a jury verdict in favor of the plaintiff in the amount of $300,000. This appeal presents us with issues, discussed but not decided in *Griffith v. Wheeling Pittsburgh Steel Corporation,* 521 F.2d 31, 44–45 (3d Cir. 1975), concerning the proper construction and application of the negligence remedy created by § 18(a) of the Longshoremen's and Harbor Workers' Compensation Act Amendment of 1972, Pub.L. No.92–576, 86 Stat. 1263, 33 U.S.C. § 905(b), amending § 5 of the Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 5, 44 Stat. 1426, 33 U.S.C. § 905 (LHWCA). Because we believe the district court misconstrued § 905(b) of the 1972 Amendments in the action below, we reverse and remand for further proceedings.

## I. THE ACCIDENT

Most of the facts of this case are undisputed; we shall identify contested portions in our statement of them below.

On August 1, 1974, the M/V Santos docked at Philadelphia, Pa. Atlantic & Gulf Stevedores, Inc. (hereinafter A & G), an independent stevedoring company, was engaged by defendant to discharge cargo from the vessel. Plaintiff, an employee of A & G, was a holdman in a gang of longshoremen assigned to discharge cargo from the No. 1 lower hold. The cargo to be discharged from the forward No. 1 hold consisted of drums of ore and packages of angle iron, 20 feet long, that were stowed lying fore and aft in this part of the hold. The drums of ore were stowed on top of the angle iron. Aft of the angle iron and drums of ore were empty wooden barrels. The distance between the empty wooden barrels and the angle iron was not over three feet.[1] The empty wooden barrels occupied two-thirds or three-quarters of the hatch opening; as a consequence about one-

half of the length of the angle iron was under the forward hatch coaming. The remaining one-third or one-quarter of the hatch opening through which the drums of ore and angle iron had to be discharged was described as being between 9 and 15 feet. The 9 to 15 foot dimension was in the fore and aft direction of the hatch. The width of the hatch opening was approximately 22 feet. There was controverted testimony by experts for both parties as to whether or not the proximity of the wooden barrels to the angle iron created a dangerous discharging situation. The gang boss for the A & G gang assigned to the No. 1 hold was a substitute for the regular gang boss. The three holdmen working with plaintiff in the No. 1 hold were not regular members of the gang; however, the plaintiff was.

Discharging the drums of ore began at 8 o'clock A.M. on August 1, 1974, and concluded at about 3:30 P.M. of that same day. Thereafter, discharging of the angle iron commenced. On August 1, 1974, angle iron was discharged until 7 o'clock P.M. Eighteen drafts of angle iron were discharged in this period. Because of the barrels, discharging of the angle iron through the 9 to 15 foot opening was accomplished by wrapping a cable three times around the ends closest to the wooden barrels and a second cable of the same length one time around the other ends. The two cables were then inserted into a hook on the end of a hoisting cable and the angle iron was lifted out of the hold by winches. In this manner the angle iron was discharged at an angle with the ends closest to the wooden barrels higher than the other ends. While discharging the angle iron on August 1, the longshoremen experienced the ends of the angle iron closest to the wooden barrels catching in the wooden barrels and in the plywood separating the tiers of wooden barrels. When the angle iron caught in the wooden barrels or the plywood, the longshoremen in the

---

1. The record does not clearly indicate the distance from the ends of the angle iron to the barrels. For instance, Egan, the longshoremen's ship boss, testified that the steel angle irons "were right up to the barrels." N.T. at 104. McGrath, the stevedoring superintendent,

testified to a distance of "a foot and a half or two feet." N.T. at 251. Johans, a cargo supervisor who inspected the vessel shortly after the accident, testified that the distance "seemed to [him] to be about two to three feet." N.T. at 328.

hold pulled the angle iron away from the wooden barrels so that it could be removed from the hold. There was controverted testimony as to whether or not the A & G ship boss had made a request to the vessel's deck officer for permission to remove the barrels.[2] The evidence is clear that the stevedore did not utilize tag lines to unload the angle iron; however, the stevedore's ship boss testified that under the circumstances their utilization would have been useless or unsafe. Also, the record indicated non-compliance by A & G, as the employer of Brown, with applicable regulations of OSHA, including 29 C.F.R. § 1918.-81(f) concerning tag lines.[3]

2. Egan testified that he had personally asked the vessel's deck officer for permission to remove the barrels. N.T. at 109–10. McGrath testified that making such a request would be within the realm of his authority, not Egan's, and that he had made no request. N.T. at 256. Zolinas, the gang boss, testified that he knew of no request to remove the barrels. N.T. at 362.

3. The applicable House Committee Report No. 92–1441 accompanying H.R. 12006, which became P.L. 92–576 containing the 1972 amendments to the LHWCA, contained this paragraph (Vol. 3, 1972 U.S.Code Cong. & Admin. News, p. 4705):

"Finally, the Committee wishes to emphasize that nothing in this bill is intended to relieve any vessels or any other persons from their obligations and duties under the Occupational Safety and Health Act of 1970. The Committee recognizes that progress has been made in reducing injuries in the longshore industry, but longshoring remains one of the most hazardous types of occupations. The Committee expects to see further progress in reducing injuries and stands ready to immediately reexamine the whole third party suit question if it appears that the changes made in present law by this bill have affected progress in improving occupational health and safety."

See also 33 U.S.C. § 941(a)(1970) of the LHWCA, quoted below at page 860.

The OSHA Safety and Health Regulations for Longshoring, 29 C.F.R. § 1918.1, et seq., in sections pertinent to this case, provide inter alia:

"§ 1918.2 Scope and responsibility.

"(a) The responsibility for compliance with the regulations of this part is placed upon 'employers' as defined in § 1918.3(c).

"(b) It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom.

"§ 1918.3 Definitions.

"(a) The term 'shall' indicates provisions which are mandatory.

. . . . .

"(c) The term 'employer' means an employer any of whose employees are employed, in whole or in part, in longshoring operations or related employments, as defined herein within the Federal maritime jurisdiction on the navigable waters of the United States.

"(d) The term 'employee' means any longshoreman, or other person engaged in longshoring operations or related employments, within the Federal maritime jurisdiction on the navigable waters of the United States, other than the master, ship's officers, crew of the vessel, or any person engaged by the master to load or unload any vessel under 18 net tons.

. . . . .

Subpart D—Working Surfaces

"§ 1918.31 Hatch coverings.

"(a) No cargo, dunnage, or other material shall be loaded or unloaded by means requiring the services of employees at any partially opened intermediate deck unless either the hatch at that deck is sufficiently covered or an adequate landing area suitable for the prevailing conditions exists: Provided, however, That in no event shall such work be done unless the working area available for such employees extends for a distance of 10 feet or more fore and aft and athwartships.

"§ 1918.32 Stowed cargo and temporary landing platforms.

. . . . .

"(b) When an edge of a hatch section or of stowed cargo more than 8 feet high is so exposed that it presents a danger of an employee falling, the edge shall be guarded by a safety net of adequate strength to prevent injury to a falling employee, or by other means providing equal protection under the existing circumstances.

"(c) When two gangs are working in the same hatch on different levels, a safety net shall be rigged and securely fastened so as to prevent men or cargo from falling.

. . . . .

Subpart H—Handling Cargo

"§ 1918.81 Slinging.

"(a) Drafts shall be safely slung before being hoisted. Loose dunnage or debris hanging or protruding from loads shall be removed.

Shortly after starting work at 8 o'clock A.M. on August 2, 1974, plaintiff was injured while discharging a draft of angle iron. He was pulling the angle iron away from the wooden barrels after it caught under plywood. As he pulled on the lower end of the draft, it started swinging toward him. To avoid being struck by the swinging draft, plaintiff ran to the offshore (port) side of the vessel and began climbing up the side of the hold. As he was climbing, he grabbed a sweat batten clip located in a rib on the port side of the hold. The sweat batten clip came out of the rib, causing plaintiff to fall about 15 feet onto the angle iron. As a result of the fall, plaintiff sustained a concussion, multiple contusions, a laceration over the right eye and a dislocation of his right middle finger. Additionally, plaintiff suffered a traumatic neurosis. Plaintiff was an inpatient at Albert Einstein Medical Center from August 2 to August 5, 1974. The permanency of the plaintiff's injuries was a controverted issue at trial.

## II. THE TRIAL COURT'S INSTRUCTIONS

■ The trial judge's charge to the jury was based in part upon the Restatement (Second) of Torts § 416.[4] Pertinent portions of that charge, particularly those itali-

"(c) Drafts of lumber, pipe, dunnage and other pieces, the top layer of which is not bound by the sling, shall be slung in such a manner as to prevent sliders. Double slings shall be used on unstrapped dunnage, except when, due to the size of hatch or deep tank openings, it is impractical to use them.

"(f) Loads requiring continuous manual guidance while in motion shall be provided with tag lines.

"§ 1918.83 Stowed cargo, tiering and breaking down.
"(a) When necessary, cargo shall be secured or blocked to prevent its shifting or falling.
"(b) In breaking down, precautions shall be taken, when necessary, to prevent the remaining cargo from falling."

4. Restatement (Second) of Torts § 416 provides:
"§ 416. Work Dangerous in Absence of Special Precautions
"One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

"Comment:
"a. There is a close relation between the rule stated in this Section, and that stated in § 427, as to dangers inherent in or normal to the work. The two rules represent different forms of statement of the same general rule, that the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them. The rules stated in the two Sections have been applied more or less interchangeably in the same types of cases, and frequently have been stated in the same opinion as the same rule, or as different phases of the same rule. The rule stated in this Section is more commonly stated and applied where the employer should anticipate the need for some specific precaution, such as a railing around an excavation in the sidewalk. The rule stated in § 427 is more commonly applied where the danger involved in the work calls for a number of precautions, or involves a number of possible hazards, as in the case of blasting, or painting carried on upon a scaffold above the highway.

"d. In order for the rule stated in this Section to apply, it is not essential that the work which the contractor is employed to do be in itself an extra-hazardous or abnormally dangerous activity, or that it involve a very high degree of risk to those in the vicinity. It is sufficient that it is likely to involve a peculiar risk of physical harm unless special precautions are taken, even though the risk is not abnormally great. A 'peculiar risk' is a risk differing from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work done, which calls for special precautions."
Restatement (Second) of Torts § 427 provides:
"§ 427. Negligence as to Danger Inherent in the Work
"One who employs an independent contractor to do work involving a special danger to others which the employer knows or has rea-

cized in note 5, are set out in the margin,[5] and they contain the wording from § 416 and comments quoted in note 4. Since we

have concluded that the court's jury instructions based on § 416 are inconsistent with § 905(b).[6] a new trial will be required,

5. Pertinent portions of the district court's charge follow:

"THE COURT: . . .

"The plaintiff contends that the defendant shipowner's conduct was negligent, in that the shipowner failed to exercise ordinary care, under the circumstances, to furnish the plaintiff with reasonably safe equipment, and a reasonably safe place in which to work.

"Specifically, the plaintiff claims that the defendant shipowner was negligent in one or more of the following particulars:

"In refusing to permit barrels to be removed prior to the discharge of steel;

"In having sweat batten keepers without sweat boards;

"In that the type of keeper involved constituted a trap to the plaintiff;

"In the manner of stowing the cargo. [N.T. 566–67]

. . . . .

"It is the shipowner's duty to warn the stevedoring company of dangers known to the shipowner which are not obvious and not known to the stevedoring company. The shipowner is not obligated to supervise the work of the independent stevedoring company in unloading the cargo.

*"But, there is an exception to the general rule: a shipowner who employs an independent contractor to do work which the shipowner should recognize as likely to create, during its progress, a peculiar risk of physical harm to others, unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care and to take such precautions, even though the shipowner has provided for such precautions in the contract or otherwise, and even though the shipowner has warned the contractor of the danger.*

*"A peculiar risk is a risk different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work to be done which calls for special precautions. It is not essential that the work which the contractor is employed to do be in itself an extra hazardous or abnormally dangerous activity, or that it involve a very high degree*

son to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

*of risk to those in the vicinity. It is sufficient that it is likely to involve a peculiar risk of physical harm unless special precautions are taken, even though the risk is not abnormally great.*

*"It is not essential that the peculiar risk be one which will necessarily and inevitably arise in the course of the work no matter how it is done. It is sufficient that it is a risk not common in the community, which the shipowner should recognize as likely to arise in the course of the ordinary and usual method of doing the work, or the particular method which the shipowner knows the contractor will adopt.* [N.T. 571–72]

. . . . .

"The issues to be determined by the jury in this case, as between the plaintiff and the defendant shipowner, Ivarans Rederi Steamship Company, on the negligence claim, are these:

"First: Was the shipowner negligent in one or more of the particulars alleged?

"If your unanimous answer to that question is 'no', you will return a verdict for the defendant shipowner; but if your unanimous answer is 'yes', you then have a second issue to determine, namely:

"Second: Was the negligence of the shipowner a proximate cause of any injury and damage to the plaintiff?

"If your unanimous answer to that question is 'no', you will return a verdict for the defendant shipowner; but if your unanimous answer is 'yes', then you must find the answer to a third question, namely:

"Third: Was the plaintiff guilty of some contributory negligence?" [N.T. 577–78] (Emphasis supplied.)

6. In regard to point IV of defendant's brief, it contends that a so-called "equitable credit" defense should have been applied in the case. See generally R. Coleman and W. Daley, Equitable Credit: Apportionment of Damages According to Fault in Tripartite Litigation Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 35 Md.L.Rev. 351 (1976). The trial judge rejected this. We note that the "equitable credit" theory appears to be inconsistent with the conclusion reached in Judge Huyett's thorough opinion in *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759 (E.D.Pa.1974), *appeal dismissed,* No. 75–1223 (3d Cir., Apr. 30, 1975), *cert. denied,* 423 U.S. 866, 96 S.Ct. 127, 46 L.Ed.2d 95 (1975), and that, to date, courts considering the doctrine have generally rejected it.

The defendant also contends that there was no evidence of future impairment of earning

and it is not necessary to consider the other issues briefed by the parties.

█ In pertinent part, § 905(b) provides:

"In the event of injury to a person covered under the chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. *If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.* . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel . . ." (Emphasis supplied.)

As Judge Gibbons stated in *Griffith, supra:*

"The effect of the first clause of § 905(b) is to create . . . a new negligence third party cause of action against the vessel . . . . The second sentence relieves the vessel from liability for negligence caused by persons engaged in providing stevedoring services, *thus preventing the imposition of liability on the vessel on some respondeat superior* or absolute duty of care basis."

capacity, and that the verdict was excessive. Since there will be a new trial at which the evidence may be different, there is no need to meet these issues at this time. However, it would appear that, since these last issues are related to conflicting expert medical testimony at trial as provided by the parties' privately retained medical experts, this case presents appropriate circumstances for the district court to exercise its broad power under F.R.Evid. 706 to appoint its own medical expert in order to insure the availability to the jury of the most qualified medical testimony, unaffected by the source of the payment of the expert's fee. See also Local Rule 27 (E.D.Pa., effective January

*Id.* at 40 (emphasis supplied) (footnote omitted). The conclusion of the *Griffith* court contrasts sharply with the Restatement's view of the theoretical basis underlying § 416, as follows:

## "HARM CAUSED BY NEGLIGENCE OF A CAREFULLY SELECTED INDEPENDENT CONTRACTOR

"Introductory Note: The rules stated in the following §§ 416–429, unlike those stated in the preceding §§ 410–415, do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. *They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor.* The liability imposed is closely analogous to that of a master for the negligence of his servant.

"The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted. Such duties have been recognized in a series of exceptions to the 'general rule' of non-liability stated in § 409, which are stated in the following Sections in this Topic."

1, 1970); F. Van Dusen, *A United States District Judge's View of the Impartial Medical Expert System,* 32 F.R.D. 498 (1963).

Under the terms of 33 U.S.C. § 933, it is clear that the injured longshoreman or his estate, as the case may be, cannot retain both a jury verdict against the ship in an action under § 905(b) and the compensation payable under 33 U.S.C. § 904. See *Johnson v. Sword Line, Inc.,* 257 F.2d 541, 546 (3d Cir. 1958); *The Etna,* 138 F.2d 37, 41 (3d Cir. 1943); 1A Benedict on Admiralty § 29 (7th ed. rev., 1973 release); G. Gilmore and C. Black, Law of Admiralty (2d ed. 1975), note 336 at page 437.

Restatement (Second) of Torts at 394 (emphasis supplied). However, express language in the statute and the legislative reports accompanying the 1972 Amendments amply demonstrate that for reasons of policy the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore.[6a] For instance, § 941(a), retained from the older Act, provides:

"Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees." [7]

33 U.S.C. § 941(a) (1970).

The Senate Report demonstrates the Congress was aware of the effective focus of § 941(a) when it enacted the 1972 Amendments. As stated in that report:

"It is important to note that adequate workmen's compensation benefits are not

---

**6a.** Although the stevedore has this duty specifically mandated by Congress, the legislative history of P.L. 92–576 indicates, by the following wording, that the shipowner would have a duty to use reasonable care to provide a safe place *to work* under appropriate circumstances contemplated by § 905(b), as amended:

"Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended *to derogate from the vessel's responsibility* to take appropriate corrective action where it knows or should have known about a dangerous condition."

House Committee Report No. 92–1441 (Vol. 3, 1972 U.S.Code Cong. & Admin.News, p. 4704). See 1A Benedict on Admiralty, *supra*, § 114, at pp. 6–12 to 6–15.

**7.** The term "employer" *is defined by the definition of "employees" covered under the Act. As Judge Gibbons recently noted in *Sea-Land v. Director, Office of Workers' Compensation Programs*, 540 F.2d 629 (3d Cir. 1976):

"Prior to 1972 the term 'employee' was defined in § 2(3) of the LHWCA, 33 U.S.C. § 902(3) only negatively:

'The term "employee" *does not include a* master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.'

The scope of the Act's affirmative coverage was derived from the definition of 'employer' in § 2(4), and the 'coverage' provisions in § 3(a). An 'employer' *was described as an* employer of persons 'employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock).' 33 U.S.C. § 902(4).

. . . .

"Of concern for purposes of this case are the revised definitions of 'employer,' § 2(4), and 'employee,' § 2(3), and the revised 'coverage' provision of § 3(a). In place of the merely negative *definition of 'employee' given by the* 1927 Act (which excluded crew members), Congress substituted the following language:

'The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.'

33 U.S.C. § 902(3).

"Thus the exclusion of crew members was retained, but an affirmative listing of occupations functionally related to the maritime transportation industry was added. For this case the key words are 'longshoreman or other person engaged in longshoring operations.'

"The 1972 amendments also changed the 'employer' definition by omitting the limitation 'upon the navigable waters of the United States' and substituting

'The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).'

33 U.S.C. § 902(4)."

*Id.* at 632.

only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.

"This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry, and such means clearly include vigorous enforcement of the Maritime Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement."

Senate Report No. 92–1125, 92d Cong., 2d Sess., 2 (1972).

These authorities highlight the principal shortcoming of § 416 as a basis of imposing liability on the shipowner: it contravenes the express statutory purpose of § 905(b) by imposing vicarious liability on the shipowner for the negligent conduct of the stevedore or the stevedore's employees. The plaintiff admits as much in his brief, but asserts that the error in basing the charge on the wording of § 416 was harmless because the plaintiff's proofs showed that the vessel owner was at fault and "had scienter" (plaintiff's brief at 20). These assertions do not advance the plaintiff's position since, even if the jury disbelieved the plaintiff's witnesses under the instruction as given,[8] they could still have held the defendant liable on the basis of the inaccurate statement of law in the charge. As this court has recently stated:

"[2, 3] It is the responsibility of the trial judge to provide the jury with a clear and accurate statement of the law it is expected to apply in reaching its verdict. . . . As long as the instructions 'show no tendency to confuse or mislead the jury,' an appellate court will presume that the jury's verdict was reached in accordance with the law. *McPhee v. Reichel*, 461 F.2d 947, 950–51 (3d Cir. 1972). The jury must be able to 'intelligently determine the questions presented.' *Delancey v. Motichek Towing Service Inc.*, 427 F.2d 897, 902 (5th Cir. 1970)."

*Hunziker v. Scheidemantle*, 543 F.2d 489 at 498 (3d Cir. 1976).

Under the facts of this case, we hold that this standard has not been met.

Finally the plaintiff contends that because Pennsylvania was the state of the plaintiff's employment and injuries, Pennsylvania third party tort concepts ought to form the appropriate reference for § 905(b) liability in this case. This last argument is based upon two assumptions: first, that failure to incorporate the state standards into the case is unjustified because longshoremen would then have fewer rights than workers injured on land, and, second, that the standard of uniformity expressed in the congressional reports accompanying the 1972 Amendments "deals with the essential features of the Maritime Law such as assumption of the risk and contributory negligence, and does not require an absolute uniformity." See page 2, plaintiff's letter of 9/17/76.

As noted by Judge Gibbons in *Griffith, supra* at note 21:

"The House Report states:

'Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel

---

8. See footnote 5, *supra*.

shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.

. . . . .

'Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable.' 3 U.S.Code Cong. & Admin.News, pp. 4704, 4705 (1972)" (Emphasis supplied.)

The above italicized language from the House Report indicates that Congress wished a uniform federal law, as opposed to the varying negligence concepts in the areas where accidents occur, to govern liability of the shipowner under § 905(b). See Southern Pacific v. Jensen, 244 U.S. 205, 215–17, 37 S.Ct. 524, 528, 61 L.Ed. 1086 (1917), where the Supreme Court said:

"Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country. Butler v. Boston & Savannah Steamship Co., 130 U.S. 527 [9 S.Ct. 612, 32 L.Ed. 1017]; In re Garnett, 141 U.S. 1, 14 [11 S.Ct. 840, 35 L.Ed. 63]. And further, that in the absence of some controlling statute the general maritime law as accepted by the federal courts constitutes part of our national law applicable to matters within the admiralty and maritime jurisdiction. The Lottawanna, 21 Wall. 558 [22 L.Ed. 654]; Butler v. Boston & Savannah Steamship Co., 130 U.S. 527, 557 [9 S.Ct. 612, 32 L.Ed. 1017]; Workman v. New York City, 179 U.S. 552 [21 S.Ct. 212, 45 L.Ed. 314].

"In The Lottawanna, Mr. Justice Bradley speaking for the court said: 'That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction." . . . One thing, however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been intended to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.'

"By § 9, Judiciary Act of 1789, 1 Stat. 76, 77, the District Courts of the United States were given 'exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction; . . . saving to suitors, in all cases, the right of common law remedy, where the common law is competent to give it.' And this grant has been continued. Judicial Code, §§ 24 and 256.

"In view of these constitutional provisions and the federal act it would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation. That this

may be done to some extent cannot be denied. A lien upon a vessel for repairs in her own port may be given by state statute, *The Lottawanna*, 21 Wall. 558, 579, 580 [22 L.Ed. 654]; *The J. E. Rumbell*, 148 U.S. 1 [13 S.Ct. 498, 37 L.Ed. 345]; pilotage fees fixed, *Cooley v. Board of Wardens*, 12 How. 299 [13 L.Ed. 996]; *Ex parte McNiel*, 13 Wall. 236, 242 [20 L.Ed. 624]; and the right given to recover in death cases, *The Hamilton*, 207 U.S. 398 [28 S.Ct. 133, 52 L.Ed. 264]; *La Bourgogne*, 210 U.S. 95, 138 [28 S.Ct. 664, 52 L.Ed. 973]. See *The City of Norwalk* [D.C.N.Y.], 55 F. 98, 106. Equally well established is the rule that state statutes may not contravene an applicable act of Congress or affect the general maritime law beyond certain limits. They cannot authorize proceedings *in rem* according to the course in admiralty, *The Moses Taylor*, 4 Wall. 411 [18 L.Ed. 397]; *Steamboat Co. v. Chase*, 16 Wall. 522, 534 [21 L.Ed. 369]; *The Glide*, 167 U.S. 606 [17 S.Ct. 930, 42 L.Ed. 296]; nor create liens for materials used in repairing a foreign ship, *The Roanoke*, 189 U.S. 185 [23 S.Ct. 491, 47 L.Ed. 770]. See *Workman v. New York City*, 179 U.S. 552 [21 S.Ct. 212, 45 L.Ed. 314]. And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by an act of Congress or works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations. This limitation, at the least, is

essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself. These purposes are forcefully indicated in the foregoing quotations from *The Lottawanna*."

.        .        .        .        .

"The work of a stevedore in which the deceased was engaging is maritime in its nature; his employment was a maritime contract; the injuries which he received were likewise maritime; and the rights and liabilities of the parties in connection therewith were matters clearly within the admiralty jurisdiction. *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, 59, 60 [34 S.Ct. 733, 58 L.Ed. 1208].

### III. THE STANDARD OF CARE

█ The parties in this case would have us suggest to the district court the standard of care a vessel owes to a longshoreman under the negligence remedy created by § 905(b). It would appear that the principles of the law of negligence, as adopted in the admiralty field during the history of our country, are to form the basis of any recovery against shipowners insofar as such principles are not inconsistent with § 905(b).[9] See, *e. g. Kermarec, supra* at 628, 79 S.Ct. 406, 3 L.Ed.2d 550; *Socony-Vacuum Co. v. Smith*, 305 U.S. 424, 431–32, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *Jensen, supra*; see also, for example, *Bess v. Agromar Line*, 518 F.2d 738, 740–43 (4th Cir. 1975); §§ 281–83, as well as 302A, 305 and 452, Restatement (Second) of Torts, in light of the regulations set forth in note 3 and the text at pages 855–856 above.[10]

9. As the Supreme Court stated in *Kermarec v. Compagnie General Transatlantique*, 358 U.S. 625, 630–32, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959):

"The issue must be decided in the performance of the Court's function in declaring the general maritime law, free from inappropriate common-law concepts. *The Lottawanna*, 21 Wall. 558 [22 L.Ed. 654]; *The Max Morris*, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed.2d 586].[5]

"[5] Where there is no impingement upon legislative policy. Cf. *United States v. Atlantic Mut. Ins. Co.*, 343 U.S. 236 [72 S.Ct. 666,

96 L.Ed. 907] *Halcyon Lines v. Haenn Ship Corp.*, 342 U.S. 282 [72 S.Ct. 277, 96 L.Ed. 318]."

.        .        .        .        .

"We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case.

10. Since *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines*, 536 F.2d 505 (2d Cir. 1976), cited during oral argument, (1) relied on § 343A

The judgment in favor of Brown and against Ivarans Rederi A/S will be reversed and the case will be remanded for further proceedings consistent with this opinion.

of the Restatement (Second) of Torts (page 508 of 536 F.2d), which in comment (e) is based on the doctrine of assumption of risk specifically rejected by Congress in the 1972 legislation (see page 861 above), and (2) the vessel owner acted as its own stevedore in that case, we do not find it persuasive on the facts presented by this appeal.