**John J. DOUGHERTY**

v.

**Christian HAALAND.**

**Civ. A. No. 76–1703.**

United States District Court,
E. D. Pennsylvania.

Sept. 25, 1978.

Stanley B. Gruber, Philadelphia, Pa., for plaintiff.

Carl A. Putz, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Plaintiff was injured on July 8, 1974, while working as a longshoreman on the M/S Concordia Tarek, which was moored at Girard Point in Philadelphia. On May 28, 1976, plaintiff instituted this tort action against the shipowner under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 905(b) (Supp. V 1975). Jurisdiction is based solely on diversity of citizenship. The case was tried before a jury in November of 1977, and, at the close of plaintiff's case, defendant moved for a directed verdict. *See generally* Fed.R.Civ.P. 50(a). I reserved decision on that motion until the close of all the evidence, at which time I granted the motion and discharged the jury. Plaintiff then made a timely motion for a new trial, asserting that I erred in directing a verdict for defendant. *See generally* Fed.R.Civ.P. 59(a). After considering carefully the points raised by plaintiff in support of his motion, I conclude, for the reasons set out in this opinion, that the motion must be denied.

In 1972, Congress completely overhauled the Longshoremen's and Harbor Workers' Compensation Act of 1927 (LHWCA). *See* Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No.92–576, 86 Stat. 1263. By so doing, Congress "sought to achieve several goals: ade-

quate, increased and sure compensation for injured longshoremen, elimination of the rubric of liability without fault for shipowners, and encouragement of safety within the industry by placing the duty of care on the party best able to prevent accidents." *Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d 837, 839 (2d Cir. 1977) (Kaufman, J.).

Under the 1972 amendments, an injured longshoreman may no longer recover from the vessel for breach of an implied warranty of seaworthiness, as he formerly could under *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). *E. g., Samuels v. Empresa Lineas Maritimas Argentinas,* 573 F.2d 884, 888 (5th Cir. 1978); *Briley v. Charente S.S. Co., Ltd.,* 572 F.2d 498, 499 (5th Cir. 1978) (per curiam); *Davison v. Pacific Inland Navigation Co.,* 569 F.2d 507, 511–12 (9th Cir. 1978). However, Congress did preserve the longshoreman's negligence action against the vessel. 33 U.S.C. § 905(b) (Supp. V 1975). Unfortunately, the statute fails to specify the standard of care to which the vessel may be held, and, as a result, "the legal waters surrounding the question of the proper standard have swirled turgidly with confusion and controversy." *Davis v. Inca Compania Naviera S.A.,* 440 F.Supp. 448, 451 (W.D.Wash.1977) (footnotes omitted). Although plaintiff here has proffered several different legal theories, I conclude that the evidence adduced at trial was insufficient to support a verdict for plaintiff under any of the potentially applicable standards of care, and that it was therefore proper to direct a verdict for defendant.

In essence, this motion for a new trial raises only one issue, *i. e.,* whether plaintiff presented enough evidence to withstand defendant's motion for a directed verdict. In considering the instant motion, I shall of course view the evidence in the light most favorable to plaintiff, as I am required to do on a motion for a directed verdict. *See Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978); *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969).

The evidence presented at trial may be summarized as follows. On the day of the accident, plaintiff was employed as a longshoreman on the Philadelphia waterfront. His employer was the Independent Pier Company, a stevedoring concern. On the day in question, plaintiff was a holdman with a hatch gang that was assigned to load sections of fifteen-inch diameter metal pipe, each about fifty feet long and weighing about half a ton, into the lower hold of the ship's number 3 hatch. As plaintiff boarded the ship at eight o'clock that morning, he noticed that it was listing to the inshore side. N.T. 18–19. The extent of this list was approximately five to eight degrees. N.T. 85, 106.

When the longshoremen opened the number 3 hatch, they saw that thirty tons of five-inch pipe, stacked two tiers high, was already stowed in the offshore side of the lower hold. They decided that, in order to help correct the ship's list, they would stack up the thirty-foot sections of pipe into the wing, and then load the longer and heavier sections of pipe on the offshore side of the hold, alongside and inboard the thirty-foot sections. The longshoremen lowered a forklift into the lower hold, intending to use it to stack up the shorter pipe that was already stowed there, but an unidentified ship's mate instructed the hatch gang's foreman that the longer pipe was to be stowed on the inshore side of the hold. Edward McKenna, the foreman, argued with the mate, contending that it would be more logical to stow the pipe on the offshore side rather than on the inshore side, because the ship was already listing to the inshore side. The ship's mate insisted that the pipe be stowed on the inshore side, however, and McKenna instructed his men to do so.

The longshoremen then began to load the pipe into the inshore wing of the hold. They lowered and stowed without incident six or eight sections of pipe, in drafts of two each, although plaintiff continued to complain to his foreman about working the inshore side of the ship. N.T. 28. A ship's mate then asked McKenna whether his men were putting plywood between the sections

of pipe being loaded and the steel deck of the lower hold. McKenna, who was on the upper deck, called down into the hold and instructed the men to put plywood under the pipe to keep it from sliding around. There was very little plywood in the hold at that time, and the holdmen asked that more plywood be sent down. Before this could be done, plaintiff picked up a piece that was already in the hold and attempted to place it under a section of pipe that had just been lowered. The pipe was then resting on two wooden "chocks," and a holdman was steadying it at each end. One man apparently lost control of his end, and the pipe rolled inshore with the ship's list, striking and injuring plaintiff. N.T. 108.

It is undisputed that the ship's mate had the authority to direct where in the vessel particular cargo was to be stowed, and, in particular, to direct that the pipe taken on at Philadelphia be stowed on the inshore, rather than the offshore, side of the lower hold. N.T. 75, 143. It is also undisputed that the longshoremen exercised complete control of the loading operation, apart from the mate's direction that the pipe be stowed on the inshore side of the ship.

In light of the uncertainty surrounding the applicable standard of care in longshoremen's negligence actions under section 905(b), plaintiff has sought in his written submissions to bring the facts of this case within eight distinct theories of liability. Six of these theories are set out in various sections of the Restatement (Second) of Torts; the others are the unseaworthiness theory mentioned earlier and the *Gallardo* theory, derived from *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484 (N.D. Cal.1977).

■ At the outset, it appears that three of the eight theories are in fact unavailable

to plaintiff, and I will briefly address these three before considering whether the evidence adduced at trial warranted submitting this case to the jury under any of plaintiff's other theories of liability. First, as I noted earlier, an injured longshoreman may no longer recover from the vessel for breach of an implied warranty of seaworthiness. *See* cases cited *supra*; H.R.Rep. No.92–1441, 92nd Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4701–05; S.Rep.No. 92–1125, 92d Cong., 2d Sess. 8–12 (1972). Second, although there is law in other circuits to the contrary, the Third Circuit has intimated that the duties imposed on possessors of land by sections 342 and 343 of the Restatement (Second) of Torts are not to be imposed on vessels. *See Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1249–50 n. 35 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863–64 n. 10 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). *Accord, Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 at 687–688 (2d Cir. 1978) (Friendly, J., dissenting in part), *petition for cert. filed*, 47 U.S.L.W. 3148 (U.S. Aug. 30, 1978) (No. 78–358).[1] *Contra, e. g., Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331 (5th Cir. 1977) (Wisdom, J.); *Gay v. Ocean Transp. & Trading Co.*, 546 F.2d 1233 (5th Cir. 1977). Third, the *Gallardo* analysis, while not unpersuasive, diverges in important respects from the Third Circuit's analysis of the vessel's duties under section 905(b). These considerations led Chief Judge Lord to reject the *Gallardo* analysis in a recent opinion, and I am entirely in agreement with his conclusion. *See Blackburn v. Prudential Lines, Inc.*, 454 F.Supp. 1302 at 1303–1306 (E.D.Pa.1978). Accordingly, I turn to plaintiff's five remaining theories of liability.

---

1. Judge Friendly's observations bear repeating here:

 "In retrospect it seems to have been a mistake for courts to give such talismanic significance to §§ 343 and 343A of the [Restatement (Second)] as has sometimes been done. These sections are awkwardly drafted; the framers had no notion that they would be applied to the tangled situations of ship load-

ing or unloading; and they must be read together with [§§ 409–29 of the Restatement (Second)]. In dealing with § 905(b), courts would do better to consider the policies that actuated Congress in adopting the 1972 amendments."

*Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 688 (footnote omitted).

In considering whether defendant could properly have been found liable here, I start from the general proposition that the stevedore is an independent contractor possessed of special expertise in the loading and unloading of cargo. Congress, in enacting the 1972 amendments to the LHWCA, chose to place primary responsibility for the longshoremen's safety on the stevedore, "the party best able to prevent accidents." *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837, 839 (2d Cir. 1977); *see, e. g., Marant v. Farrell Lines, Inc.*, 550 F.2d 142, 144 (3d Cir. 1977); *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 860 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). *See generally* 33 U.S.C. § 941(a) (1970). Thus, the vessel will ordinarily be justified in assuming that the stevedore and its employes, *i. e.*, the longshoremen, can safely perform the required loading or unloading operations, even under conditions that would be dangerous to those not experienced in the calling. At least this is so where, as here, no latent or concealed dangerous conditions exist aboard ship. In short, an injured longshoreman seeking to impose liability on the vessel under section 905(b) must show that the vessel was negligent in relying upon the stevedore's expertise and in assuming that the work could be safely done by the stevedore. This in turn requires a showing that (1) the conditions aboard ship created an unreasonable risk of harm, even for a longshoreman working under the guidance of an expert stevedore, and (2) the vessel, although not possessed of the stevedore's expertise, knew or should have known of this unreasonable risk of harm. *Cf. Davison v. Pacific Inland Navigation Co.*, 569 F.2d 507, 513–14 (9th Cir. 1978) (no evidence that defendant knew or should have known that cargo could not be safely discharged from barge due to its design; judgment against defendant reversed). *See generally* Restatement (Second) of Torts § 289 (1965).

## RESTATEMENT (SECOND) § 410

Plaintiff relies initially on section 410 of the Restatement (Second), which provides:

"The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself."

*Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1248–53 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), suggests that this rule is part of the federal common law that governs an injured longshoreman's negligence action against the vessel. Section 410, of course, carves out an exception to the general rule that an employer is not liable for the negligence of an independent contractor he employs. *See* Restatement (Second) of Torts § 409 (1965). This section deals with an employer's liability for negligently directing an independent contractor to do work that "is dangerous in itself, or dangerous because of the manner in which it is directed to be done." Restatement (Second) of Torts § 410, Comment a (1965).

Plaintiff suggests that the jury here might have found that the task assigned to plaintiff's hatch gang—the loading of additional cargo on the inshore side of the ship—was unreasonably dangerous in view of the ship's inshore list, and that defendant was therefore negligent in directing the longshoremen, who were employees of an independent contractor (the stevedore), to proceed in that manner. I believe, however, that such a jury determination would not be supportable on the evidence that was presented here.

In light of my earlier general observations, the proper inquiry under section 410 is two-fold: (1) Did the mate's instruction give rise to an unreasonable risk of harm to the longshoremen, notwithstanding that they were working under the direction of an expert stevedore? (2) If so, did defendant know, or should it have known, of this unreasonable risk of harm?

With regard to the first question, I expressed considerable doubt at the time of trial that plaintiff had presented enough

evidence to warrant submitting this issue to the jury. Although I remain doubtful, I recognize that the following exchange between plaintiff's counsel and Paul J. Keeler, a maritime consultant called as a defense witness, arguably could support a jury finding that an experienced stevedore could not have safely carried out the mate's instruction:

"Q. And would it be a safe practice in your opinion for the mate on that vessel to direct the longshoremen to work in the same direction as a five-degree list?

. . . . .

A. To work in the direction, you mean on the low side of the list, or the high side?

Q. The low side.

A. With what kind of cargo?

Q. The 15-inch pipe we talked about in this case.

A. With how much list, three degrees?

Q. Five degrees, first.

A. *No way.*

Q. Now three degrees.

A. Well, I would say three degrees, with 15-inch pipe would not be a good practice either."

N.T. 197 (emphasis supplied).

With regard to the second aspect of plaintiff's case, however, I am thoroughly convinced that the evidence presented was insufficient to support a verdict in plaintiff's favor. Plaintiff offered no evidence whatever tending to show that the shipowner knew, or should have known, that an experienced stevedore could not safely load this cargo on the inshore side of the ship, given the ship's inshore list.

■ I note at the outset that plaintiff could not have carried his burden here except by presenting *expert* testimony that the shipowner knew, or should have known, that the stevedore would be unable to operate safely to accomplish the result prescribed by the mate. True, the jury generally is permitted to determine, without the aid of expert testimony, whether an actor should have known that his conduct exposed another to an unreasonable risk of harm. *Compare* Restatement (Second) of Torts § 289 (1965) *with id.* § 328C(b). In the context of a longshoreman's negligence action, however, the question whether the vessel knew, or should have known, that the stevedore would be unable to operate safely in light of certain conditions aboard ship cannot be answered without some fairly specific knowledge of the relationship among the vessel, the stevedore, and the longshoremen. The trier of fact usually will need to know, for example, how the responsibility for the safe conduct of loading operations is allocated between the vessel and the stevedore. In particular, the trier of fact will need to know the extent to which ships' officers generally may be charged with knowledge of the stevedore's ability, or inability, to safely perform loading operations under various conditions. These matters clearly lie outside the common knowledge and experience of ordinary persons. Consequently, the jury *must* receive guidance from persons with special knowledge of, or experience in, these matters if it is to appraise the situation accurately. *Cf., e. g., Robinson v. Wirts*, 387 Pa. 291, 297, 127 A.2d 706, 710 (1956) (Stern, C. J.) (because jurors in medical malpractice cases "would presumably lack the necessary knowledge and experience to render a just and proper decision, they must be guided by the opinions of witnesses having special or expert qualifications"); *Ragan v. Steen*, 229 Pa.Super. 515, 331 A.2d 724 (1974) (same).

Plaintiff argues here, as he originally did in opposing the directed verdict, that Mr. Keeler's testimony provided a basis for the jury to determine that the shipowner was negligent. I fail to see how Mr. Keeler's testimony could support such an inference. Mr. Keeler did not testify that the ship's officers *actually* knew that the operating conditions presented an unreasonable danger to the stevedore, nor did he testify that the ship's officers *should* have known of the alleged danger. Rather, Mr. Keeler simply gave his own expert opinion that the holdmen were working under dangerous conditions, and he never addressed the question whether the ship's officers should have per-

ceived that these conditions were unreasonably dangerous.

Mr. Keeler's testimony consistently reflected the view that the stevedore, rather than the ship's personnel, is primarily responsible for conducting operations safely. Thus, Mr. Keeler testified that the ship's boss, the highest-ranking employee of the stevedore, makes a preliminary inspection of the ship before any of his men board it, and that if he observes any grave safety hazards, it is up to him to insist that they be rectified before his men begin work on the ship. N.T. 154–57, 199–200. Mr. Keeler also specifically testified that, if a ship's boss observes a list that makes it dangerous for his men to load cargo, he is then obliged to order that work be halted until the list is corrected, rather than to permit his men to "work out" the list by rearranging cargo. N.T. 155–56. There was no testimony here that the ship's boss ever complained about the list, or that *anyone* requested on behalf of the stevedore that the ship itself correct the list.[2] The ship's officers evidently assumed, from the absence of such complaints or requests, that the stevedore would be able safely to perform the loading operation, notwithstanding the ship's list. Plaintiff offered no evidence, expert or otherwise, that this assumption was unreasonable, *i. e.*, that the ship's officers knew, or should have known, that the holdmen were in fact working under unreasonably dangerous conditions.

Plaintiff points to the deposition testimony of Captain Lars Vedo, the chief officer aboard the M/S Concordia Tarek on the day of the accident. The following excerpt from Captain Vedo's testimony on cross-examination is pertinent here:

"Q. . . .

I want you to assume that there was in fact a list to the inshore or port side during the morning of July 8, 1974. I want you . . . to also assume that the stevedore hatch boss *asked permission* from the deck officer who was on hand at Number 3 [hatch] to take corrective action in order to adjust this list.

Now, assuming those facts, what would be the normal course for the deck officer on duty at that time?

MR. PUTZ: I'll object. I don't know what you mean by 'normal course.' You mean, would he come to this witness; would he give authority? What would he do?

MR. GRUBER: That's right.

MR. PUTZ: I see.

THE WITNESS: We would straighten up the ship.

BY MR. GRUBER:

Q. Straighten up the ship?

A. Yes."

N.T. 68–69 (emphasis supplied).

Without belaboring the point, I fail to see how Captain Vedo's apparently unresponsive testimony could support an inference that the shipowner was negligent here. At the most, the jury might have inferred from the testimony quoted above that the ship's mate should have interpreted McKenna's request that his men be permitted to work the offshore side, in an effort to correct the list, as a request that the vessel *itself* correct the list, and further that such requests, if made, are normally granted. Even if the jury drew both of those inferences, however, it would still have had no basis for charging the vessel's officers with knowledge that it was unreasonably dangerous to load the cargo on the inshore side, given the ship's inshore list. There was no testimony that McKenna communicated to the mate any concern about the *safety* of working the inshore side of the ship, nor was there any evidence that a request to straighten up the vessel generally is made only where the stevedore believes the list is dangerous, rather than simply inconvenient. Accordingly, without the aid of additional

---

**2.** Mr. McKenna, plaintiff's hatch boss, simply requested that his men be permitted to try to correct the list themselves. In light of Mr. Keeler's uncontroverted testimony that 30 tons of cargo in the lower hold would have had absolutely no effect on the vessel's list, it appears that the longshoremen's proposed course of action would have proven completely ineffective. N.T. 162–70.

expert testimony, the jury would have had to resort to pure speculation in order to infer from McKenna's request that the vessel should have known that it was unreasonably dangerous to load the cargo on the inshore side, given the ship's inshore list. Plaintiff therefore was not entitled to go to the jury under section 410 of the Restatement (Second).

### RESTATEMENT (SECOND) § 414

Plaintiff also relies on section 414 of the Restatement (Second) of Torts (1965), which provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Once again, *Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1251–52 (3d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), suggests that section 414 is part of the federal common law that governs longshoremen's negligence actions under the LHWCA.

Plaintiff contends that the shipowner here retained control of the loading operation, in that the ship's mate directed the holdmen to stow the pipe on the inshore side of the ship. Defendant, by way of response, argues that the holdmen were free to use any method they chose in stowing the pipe, and to take any safety precautions they thought appropriate, so that it did not retain "control" over the work within the meaning of section 414. I agree that defendant here did not retain "control" of the work within the meaning of section 414. To begin with, the panel in *Hurst, supra,* expressly held that the shipowner's ultimate control over stevedoring operations, *i. e.,* its power to halt the operations at any time, does not amount to "control" as that term is used in section 414. 554 F.2d at 1251. The *Hurst* panel noted that a contrary rule would effectively impose on the vessel a nondelegable duty to supervise stevedoring operations, and that the legislative history of section 905(b) made it plain that Congress sought to preclude the imposition of nondelegable duties on shipowners. *Id.*

■ Here, of course, plaintiff does not rely solely on defendant's ultimate power to terminate stevedoring operations. Rather, he emphasizes its direction that the pipe be stowed on the inshore wing of the hold. However, in view of the testimony here that the vessel generally determines where each particular part of its cargo is to be stowed, I cannot agree that mere control over where cargo is stowed, without more, amounts to control of the loading operation itself. The vessel, by specifying where the cargo is to be stowed, in effect requires the stevedore to accomplish a particular result. Yet the employer of an independent contractor generally does not retain control of the work simply by specifying the result that the contractor must accomplish. Although the stevedore is required to load the cargo in a certain location, it nevertheless remains "entirely free to do the work in [its] own way." Restatement (Second) of Torts § 414, Comment c (1965). Thus, it may direct its employees to use certain equipment, or to take special precautionary measures, in order safely to accomplish the job. The stevedore, in short, retains control of the work. *See, e. g., Wescott v. Impresas Armadoras, S.A. Panama,* 564 F.2d 875, 882–83 & n. 8 (9th Cir. 1977).

I realize that in some unusual cases, the vessel's direction to stow cargo in a particular location may, as a practical matter, leave the stevedore with little or no control over how the task is to be carried out. For example, a mate's direction to stow an oddly-shaped ten-ton counterweight in a narrow space between two other items of cargo may entail a direction to stow the weight in a particular position, if the weight cannot practicably be stowed in any other way. *See Butler v. O/Y Finnlines, Ltd.,* 537 F.2d 1205, 1208 (4th Cir. 1976) ("[i]nherent in the mate's choice of *where* . . . was a direction as to *how*"). Under circumstances such as those, it might properly be said

that the vessel retains control of the work, and the vessel might properly be held liable for a negligent direction. In this case, however, no evidence was presented to show that the mate's direction to load the inshore side of the hold effectively dictated the method by which the stevedore would accomplish that task. There was, therefore, no evidence to support a finding that the shipowner retained control of any part of the work, and it consequently cannot be held liable under section 414.

### RESTATEMENT (SECOND) § 302A

■ Plaintiff also seeks to impose liability on the shipowner under section 302A of the Restatement (Second), which states that "[a]n act . . . may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent . . . conduct of the other or a third person." In short, plaintiff contends that the mate's order to load the pipe on the inshore side of the ship created an unreasonable risk of harm to plaintiff because of the likelihood that plaintiff or other members of his hatch gang would act negligently in carrying out that order. *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), suggests that section 302A is part of the federal common law governing longshoremen's negligence actions under the LHWCA. On the evidence presented here, however, plaintiff was not entitled to go to the jury under section 302A. There was no evidence here that defendant knew that the holdmen were likely to be careless in loading the cargo on the inshore side of the ship, nor was there any evidence to support an inference that defendant should have foreseen the likelihood of negligence on their part.

### RESTATEMENT (SECOND) § 305

■ Plaintiff also invokes section 305 of the Restatement (Second), which provides that "[a]n act may be negligent if the actor . . . should realize that it is likely to prevent, another or a third person from

taking action which the actor . . . should realize is necessary for the aid or protection of the other." In short, plaintiff urges that the mate's instructions to the holdmen prevented them from working against the ship's list, and that working *against* the list was necessary for the aid or protection of plaintiff. Section 305 is apparently part of the federal common law that governs longshoremen's negligence actions under the LHWCA. *See Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). On the evidence presented here, however, section 305 does not aid plaintiff's case. Indeed, plaintiff's contention here—that the shipowner exposed plaintiff to an unreasonable risk of harm by preventing the holdmen from working in a safe manner (*i. e.*, by loading the offshore side of the ship)—is essentially the same contention he raised under section 410 of the Restatement (Second), *i. e.*, that the vessel was negligent in directing the holdmen to work the inshore side of the ship. I have already noted, however, that the evidence offered at trial was insufficient to permit a jury determination that the vessel was negligent in this regard, and the same conclusion obtains here, notwithstanding that plaintiff's theory of negligence under section 305 differs slightly from his theory under section 410.

The fact of the matter is that the ship's list created a danger for the longshoremen, whether they worked *with* the list or *against* it. Mr. Keeler's testimony, upon which plaintiff relies so heavily, clearly established that loading the pipe against the list, as plaintiff contends he should have been permitted to do, would itself have been in dangerous undertaking, perhaps even more dangerous than working *with* the list. N.T. 166–72, 192–97.

### RESTATEMENT (SECOND) § 452(1)

■ Finally, plaintiff apparently seeks to recover under section 452(1) of the Restatement (Second), which provides that, in general, "the failure of a third person to act to prevent harm to another threatened by

the actor's negligent conduct is not a superseding cause of such harm." However, section 452(1) does not in and of itself impose liability on the actor for his negligent conduct; it simply provides that a third person's failure to act "does not *relieve* the actor of liability for the harm which he has in fact caused." Restatement (Second) of Torts § 452, Comment a (1965) (emphasis supplied). Thus, section 452(1) does not become applicable until it appears that the actor was in fact negligent and that he seeks to avoid liability for his conduct on the ground that a third party's failure to act was a superseding cause of the harm that the actor caused. As I have already noted, plaintiff has failed to establish defendant's negligence in the first instance, and so section 452(1) cannot avail him here.

In sum, then, I find that the evidence presented here was insufficient to permit a jury to find in plaintiff's favor under any of the potentially applicable theories of liability that he advances. Defendant was therefore entitled to the direction of a verdict in its favor. Inasmuch as plaintiff's motion for a new trial is premised entirely on the asserted error in directing a verdict for defendant, I conclude that plaintiff's motion must be denied.