**Robert HURST, Appellant,**

v.

**TRIAD SHIPPING COMPANY. (D.C. Civil Action No. 74–1143).**

**Leslie MINUS, Appellant,**

v.

**TRIAD SHIPPING COMPANY. (D.C. Civil Action No. 74–1573).**

**TRIAD SHIPPING COMPANY, Appellant,**

v.

**LAVINO SHIPPING COMPANY. (D.C. Civil No. 76–2772).**

**Nos. 76–1923 and 76–2562.**

United States Court of Appeals, Third Circuit.

Argued Feb. 24, 1977.

Decided April 25, 1977.

---

* Of Southern District of New York, sitting by designation.

Charles F. Love, Charles Sovel, Freedman, Lorry, Vigderman, Weiner & Sovel, Philadelphia, Pa., for Hurst and Minus.

Robert B. White, Jr., Rawle & Henderson, Philadelphia, Pa., for Triad Shipping Co.

E. Alfred Smith, Krusen, Evans & Byrne, Philadelphia, Pa., of American Export Lines, Inc., et al., as amici curiae.

Clayton H. Thomas, Jr., Charles W. Craven, Marshall, Dennehey & Warner, Philadelphia, Pa., for Lavino Shipping Co.

Before ADAMS, KALODNER* and HUNTER, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

This case involves two consolidated appeals. In the first, No. 76–1923, Robert Hurst and Leslie Minus, two longshoremen, brought suits for damages against the Triad Shipping Company under amended section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 905(b) (Supp. II 1972).[1] The District Court for the Eastern District of Pennsylvania entered judgment on a directed verdict against both plaintiffs. On appeal, Hurst and Minus raise two issues crucial to the operation of the legislative compromise embodied in the 1972 amendments to the Longshoremen's Act: (1) the constitutionality of congressional abolition, in sec-

---

\* Judge Kalodner participated in the argument in this case and in the conference following the argument. However, his death occurred prior to the filing of this opinion.

1. Section 905(b) reads as follows:

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

tion 905(b), of the longshoreman's suit for unseaworthiness, and (2) the standard of care to which shipowners are to be held in longshoremen's negligence actions under section 905(b). Because we hold section 905(b) constitutional and conclude that the court below applied the proper rule concerning the standard of care, we affirm.

Triad argues that if the congressional abolition of the unseaworthiness cause of action in amended section 905(b) is held to be unconstitutional thereby exposing Triad to liability without fault, then the concomitant elimination in the same section of Triad's right of indemnification from the stevedoring company must also be unconstitutional. The district court concluded that both provisions of section 905(b) are constitutional and, therefore, granted summary judgment for Lavino on the indemnity claim. Because we hold today that the abolition of the unseaworthiness remedy is constitutional, Triad's sole argument is obviated. Thus, we affirm the granting of summary judgment.

## I.

On May 14, 1973, the S.S. Island Archon, a vessel owned and operated by Triad, was berthed at Girard Point in the Port of Philadelphia, on the navigable water of the United States. The time charterer of the vessel, a Japanese company called Toko Lines, had engaged Lavino Shipping Company, a stevedoring concern, to furnish the necessary manpower and equipment to discharge a cargo of steel coils from the ship. Hurst and Minus were longshoremen employed by Lavino.

At one o'clock in the afternoon of May 14, 1973, Lavino's work crew began discharging steel coils from the Number Five Hatch of the Island Archon. Among the equipment used in the operation was a shore-based crane owned and operated by Lavino. The end of the crane's cable was attached to a block on which there was a large open hook. Suspended from this open hook were two cables approximately thirty feet long referred to as "legs." The legs hung from the open hook by means of "eyes" or loops

on the end of each leg. The lower end of one leg was attached to a braided cable. There was a hook on the end of the other leg. In order to discharge the steel coils, which were shaped like doughnuts, the legs were lowered into the hold. The braided cable was pulled through the center of the core of the coils by the longshoremen and was attached to the open hook on the other leg. The cargo was then ready to be hoisted out by the crane. However, the hook from which the thirty-foot legs were suspended was unequipped with a safety catch to prevent the legs from slipping off. The parties stipulated that operation of the crane without the safety catch was unreasonably dangerous.

At three o'clock in the afternoon of May 14, Hurst and Minus began their shift in the Number Five Hatch. The legs were lowered into the hold. Minus and another longshoreman held the braided cable steady, while Hurst fed it to another longshoreman, inside the core of the coil, who was pulling the braid through. This longshoreman signalled for more wire to be lowered down so that he could pull the braided cable completely through the coil and hook it up. Accordingly, the crane operator lowered more wire. Unfortunately, the thirty-foot wire legs rubbed against the side of the coaming or hatch opening, and clamps securing the eyes caught on the side of the hatch opening, causing the eyes to be lifted off the hook. The legs fell into the hatch, injuring Hurst and Minus.

Both men filed damage suits against the shipowner, Triad. Their complaints originally contained counts of unseaworthiness, but the district court struck those counts before trial.

At trial, the plaintiffs presented three items of evidence bearing on the shipowner's alleged negligence. First, they established that the ship's chief officer was in the vicinity of Number Five Hatch during the entire course of the unloading operations, a period of some two and one-half hours. The chief officer, however, in a deposition introduced at the trial, denied observing the unsafe condition of the crane's hook until after the accident.

Second, the plaintiffs introduced testimony that it is the custom in the maritime industry for ship officers to be assigned to observe discharge operations at the various hatches. According to plaintiffs' witness, the officers make sure that the stevedore operates properly, and they have the authority to stop any operations endangering cargo, crew, or others.

Third, plaintiffs introduced expert testimony to the effect that a reasonably prudent chief officer would stop a discharge operation if he observed an unsafe hook such as that used aboard the Island Archon on the day of the accident. Plaintiffs' expert testified about the officer's authority to give such orders:[2]

> The ship's officers have a vessel, and the vessel is like their home, and they can say what happens and does not happen. It is just like you at your home. You can say what you want done and don't want done. It is just that simple.

At the close of plaintiffs' evidence, the district court considered Triad's motion for a directed verdict. Plaintiffs argued that a jury question was presented on the question of the chief officer's knowledge and that a jury could reasonably infer from the evidence that the chief officer had noted the absence of a safety catch. The court below disagreed, holding that no evidence had been introduced to controvert the chief officer's unequivocal denial of knowledge. Nor, said the court, was there anything about the officer's deposition that might have led the jury to disbelieve his denial. Finally, the court ruled that no evidence

had been introduced to demonstrate that the unsafe condition of the hook was so conspicuous that the chief officer simply could not have avoided noticing it.

The only remaining question on the directed verdict motion, then, was whether the standard of care in negligence actions under section 905(b) required that the shipowner *should have known* about the unsafe conditions created by the stevedore and protected the longshoremen therefrom. The court held that on the facts of the case there was no such duty, granted the defendant's motion, and entered judgment for defendant in both cases. Following the court's denial of their motion for rehearing, both Hurst and Minus appealed.

## II.

■ Appellants contend that the district court erred in striking the unseaworthiness claims from their complaints. They argue that the 1972 amendment of section 905(b), which eliminated the longshoreman's action based on unseaworthiness, is unconstitutional. Because we hold the abolition of unseaworthiness actions a proper exercise of congressional power, we conclude that the court below did not err in striking those counts from appellants' complaints.

## A.

The rise and fall of the longshoreman's claim based on the warranty of seaworthiness has been exhaustively chronicled elsewhere.[3] Some familiarity with the warran-

**2.** Brief for Appellants, Appendix at 148a.

**3.** *See generally Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 762 (2d Cir. 1975), *cert. denied sub nom., A/S Arcadia v. Gulf Ins. Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642, *reh. denied,* 424 U.S. 935, 96 S.Ct. 1150, 47 L.Ed.2d 343 (1976); *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759, 761–769 (E.D.Pa.1974) *(Lucas I )* (specially convened three-judge panel), *appeal dismissed,* No. 75–1223 (3d Cir., April 30, 1975), *cert. denied,* 423 U.S. 866, 96 S.Ct. 127, 46 L.Ed.2d 95 (1975); *Ramirez v. Toko Kaiun K.K.,* 385 F.Supp. 644, 648–53 (N.D.Cal.1974); G. Gilmore & C. Black, *The Law of Admiralty* 360–455 (2d ed. 1975); 1A E. Jhirad, *Benedict on Admiralty* §§ 1–14 (7th ed.

1973); George *Ship's Liability to Longshoremen Based on Unseaworthiness—Sieracki Through Usner,* 3 J. Maritime L. 45 (1970); Gorman, *The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments,* 6 J. Maritime L. 1 (1974); Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 7 J. Maritime L. 447 (1976). Theis, *Amended Section Five of the Longshoremen's and Harbor Workers' Compensation Act,* 41 Tenn.L.Rev. 773 (1974); Thompson, *Duty Owed by Shipowner Under 1972 Amendments to Longshoremen's Act Is That of Land Based Premises Owner to Business Invitee,* 6 J. Maritime L. 643 (1975).

ty's history, however, is necessary for an understanding of the 1972 amendments to the Longshoremen's Act, particularly section 905(b).

The Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. §§ 901–50 (1970), was designed as a workmen's compensation statute for longshoremen and other harbor workers. Like any workmen's compensation statute, it represented a compromise: the longshoremen gave up the prospect of huge awards from sympathetic juries, but gained the certainty of recovery without proof of their employer's fault; the employers forfeited the chance to escape liability in court, but gained assurance of much lower, administratively determined awards. 33 U.S.C. §§ 904–05 (1970). Like most workmen's compensation statutes, too, the Longshoremen's Act permitted employees to bring negligence actions against third parties who had tortiously injured them. 33 U.S.C. § 933.[4]

The 1927 Act, though, was not destined to operate as smoothly as the usual workmen's compensation statute. Professors Gilmore and Black put it thus:[5]

When [the Act] was drafted no thought, presumably, was given to the fact that maritime workers regularly work on premises (i. e., ships) owned by third parties (shipowners) which are temporarily relinquished to the employers (master stevedores) for the carrying out of, say, loading or unloading operations. Thus, the situation of employment-related injuries attributable to the acts of third parties (not employers), exceptional in the context of shore-based industrial employment, is the order of the day in maritime employment. Nevertheless, [the Act] routinely followed the state compensation acts in preserving the injured employee's right to sue third parties (as distinct from his employer) outside the framework of the compensation system.

Few third-party actions were brought by longshoremen until the 1940's. Then came two developments which began to erode the administrative scheme established by the 1927 Act. First, the Supreme Court, in *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), expanded the seaman's claim against the shipowner based on the warranty of seaworthiness[6] into a broad species of liability without fault. Second, the Court held in *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), that this broadgauge remedy was available to longshoremen as well as seamen.

Predictably, longshoremen began routinely to bring unseaworthiness claims against the shipowner after suffering injuries in the course of operations aboard a vessel. In *Alaska S.S. Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), "the Supreme Court held that the shipowner's no-fault liability extended to conditions of unseaworthiness for which a third party (e. g., a master stevedore) to whom he had relinquished control of the ship was responsible."[7] Unseaworthiness actions usually resulted in large recoveries that greatly burdened the maritime industry.[8]

In *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court recognized the unfairness of shifting the entire

---

4. See G. Gilmore & C. Black, *supra* note 3, at 409–10.

5. *Id.* at 410.

6. The availability of this remedy in American courts of admiralty and maritime jurisdiction dated from *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). Originally, it was limited to cases in which the shipowner had not exercised reasonable care in outfitting the vessel; that is, it did not cover cases in which the seaman's injuries resulted from the negligence of the crew. Tetreault, *Seamen, Seawor-*

*thiness and the Right of Harbor Workers,* 39 Cornell L.Q. 381, 392 (1954).

7. G. Gilmore & C. Black, *supra* note 3, at 410.

8. Indeed, this burden has been cited as a major cause of the maritime industry's decline in this country. *See, e. g., Hearings on S. 2485 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare,* 90th Cong., 1st Sess. 124 (1967).

burden of the stevedore's negligence onto the shipowner. The *Ryan* Court held, therefore, that shipowners found liable for a stevedore's negligence under the unseaworthiness doctrine could seek indemnity from the stevedore on a contractual theory:[9] the stevedore had implicitly warranted to perform its contract in a workmanlike manner, and this warrant entailed an agreement to indemnify the shipowner for any liability the shipowner might incur by reason of the stevedore's unworkmanlike (i. e., negligent) performance.[10]

With *Ryan,* the shipowners' burdens were eased, but the purpose of the Longshoremen's Act was entirely thwarted. Under the Act, the stevedore's duty to pay compensation to injured longshoremen regardless of fault was supposed to be "exclusive and in place of all liability of such employer to the employee."[11] *Ryan* permitted the circumvention of this exclusivity provision by allowing third parties to seek indemnification from the stevedore.[12] Hence, the balance established by the 1927 Act was disrupted. Stevedores faced not only the certainty of administrative workmen's compensation payments, but also the prospect

of indemnifying shipowners for damages awarded longshoremen in third-party suits.

Because of this double liability, stevedores' insurance rates ran as high as forty dollars per one hundred dollars of payroll.[13] Despite the high premiums, compensation rates under the Act remained quite low;[14] a great percentage of each premium dollar went toward expenses of litigation.[15] The administrative scheme envisioned by the draftsmen of the 1927 Act had been rendered grossly inefficient, and the maritime industry suffered concomitantly.[16] Moreover, the skyrocketing numbers of *Sieracki-Ryan* cases burdened the federal courts.[17]

The 1972 amendments to the Longshoremen's Act were designed to correct these problems. Under amended section 905(b),[18] the roundabout evasion of the Act's exclusivity provision was ended. The suit based on unseaworthiness was abolished, and an injured longshoreman is now remitted to an action against the third party (i. e., shipowner) only for negligence; the employer (i. e., stevedore) shall not be directly or indirectly liable over to the shipowner if negligence is established. Thus, the ship-

**9.** Contribution from the stevedore as a joint tortfeasor had earlier been precluded by *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), on the ground that creation of a rule requiring contribution was a matter for legislative, rather than judicial, action. *Halcyon Lines* left shipowners in a "situation that cried out for relief," H. Baer, *Admiralty Law of the Supreme Court* § 2–8, at 183 (1963). The *Ryan* case provided that relief. *See, e. g.,* White, *A New Look at the Shipowner's Right-Over for Shipboard Injuries,* 12 Stan.L.Rev. 717, 730 (1960).

**10.** For a thorough discussion of the development of the warranty of workmanlike performance, see *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,* 511 F.2d 1252 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975).

**11.** 33 U.S.C. § 905(a) (1970).

**12.** *See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.,* 350 U.S. 124, 135, 142, 76 S.Ct. 232, 100 L.Ed. 133 (Black, J., dissenting).

**13.** *See Hearings on S. 2318, S. 525 & S. 1547 Before the Subcomm. on Labor of the Senate*

*Comm. on Labor and Public Welfare,* 92d Cong., 2d Sess. 261, 288 (1972) (statement of Mr. Scanlan). Even at those rates, some insurance carriers considered the stevedoring industry too risky for profit. *Id.* at 657–58 (statement of Mr. Benfield).

**14.** *See* S.Rep. No. 1125, 92d Cong., 2d Sess. 4 (1972); H.R.Rep. No. 1441, 92d Cong., 2d Sess. 1 (1972), U.S.Code Cong. & Admin.News 1972, p. 4698.

**15.** *See Hearings, supra* note 14, at 283–90. While insurance rates increased 300 percent between 1961 and 1972, compensation rates remained unchanged. *Id.* at 262.

**16.** *See* note 8 *supra; Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 762 (2d Cir. 1975), *cert. denied sub nom. A/S Arcadia v. Gulf Ins. Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642, *reh. denied,* 424 U.S. 935, 96 S.Ct. 1150, 47 L.Ed.2d 343 (1976).

**17.** *See* G. Gilmore & C. Black, *supra* note 3, at 411.

**18.** *See* note 1 *supra.*

owner will no longer bear the great burden of broad, no-fault liability via the warranty of seaworthiness, and the stevedore is insulated from double liability. The administrative remedies provided by the Act will once again be the longshoremen's exclusive no-fault remedy, but in return the Act's benefits and its coverage were greatly expanded, see e. g., *Dravo Corp. v. Maxin,* 545 F.2d 374 (3d Cir. 1976); *Sea-Land Service, Inc. v. Director,* 540 F.2d 629, 638 (3d Cir. 1976).

### B.

Appellants argue that part of this 1972 congressional compromise, the abolition of the warranty of unseaworthiness, was unconstitutional. They note that Article III, section 2 of the United States Constitution extends the judicial power to "all cases of admiralty and maritime jurisdiction." This clause, contend the appellants, incorporated into the Constitution the rules of the general maritime law, thereby limiting congressional power with respect to that law. They cite *Panama Ry. Co. v. Johnson,* 264 U.S. 375, 386–87, 44 S.Ct. 391, 394, 68 L.Ed. 748 (1924), for the proposition that there are two such limits on congressional power to modify the substantive law of admiralty:

> One is that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without. Another is that the spirit and purpose of the constitutional provision require that the enactments . . . shall be co-extensive with and operate uniformly in the whole of the United States.

Appellants insist that by eliminating the longshoreman's claim based on the warranty of seaworthiness, Congress impermissibly excluded "a thing falling clearly within" maritime jurisdiction.

We reject appellants' argument for several reasons. First, it is not at all clear that the longshoreman's right to sue a shipowner or vessel for unseaworthiness is "clearly within" the maritime law in a constitutional sense. It dates, after all, only from 1946 and the *Sieracki* case.

Second, of the two limiting considerations set forth in the *Panama Ry. Co.* excerpt cited by appellants—(1) prevention of impermissible tampering with "maritime law and admiralty jurisdiction" and (2) maintenance of uniform maritime rules throughout the nation—only the second has ever been invoked to strike down a congressional enactment. *Compare, e. g., Washington v. Dawson,* 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924), *and Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920), *with, e. g., Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and *Panama Ry. Co., supra.* By way of contrast, in *Crowell* and *Panama Ry. Co.,* and in several other cases,[19] the Supreme Court has upheld congressional enactments that altered available maritime remedies to a great extent. The inescapable conclusion is that the *Panama Ry. Co.* dictum forbidding the expansion or contraction of "maritime law and admiralty jurisdiction" cannot be read, without more, as precluding the elimination by amended section 905(b) of the longshoreman's claim based on the warranty of unseaworthiness.

Third, even if some attempt is made to infuse the first limitation in the *Panama Ry. Co.* dictum with meaning, the cases cited in the previous paragraph support the conclusion of the court in *Lucas v. "Brinknes" Schiffahrts Ges.,* 387 F.Supp. 440, 443 (E.D.Pa.1974) (specially convened three-judge panel (*Lucas II*), that the limitation under consideration[20] "places bound-

---

**19.** *See, e. g. Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Gutierrez v. Waterman S.S. Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943); *Detroit Trust Co. v. The Thomas Barlum,* 293

U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934); *Richardson v. Harmon,* 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110 (1911); *The Propeller Genesee Chief,* 12 How. (53 U.S.) 443, 13 L.Ed. 1058 (1851).

**20.** The court in *Lucas II* commented on the probability that the term "law" in the phrase

aries on federal power to expand and contract admiralty jurisdiction, not on its power to arrange and rearrange substantive maritime remedies." [21] *See, e. g., The Thomas Barlum, supra,* 293 U.S. at 43–44, 55 S.Ct. 31 (1934) (and cases cited therein); G. Gilmore & C. Black, *supra* note 3, at 47. And in light of the Supreme Court's repeated approval of major congressional changes in admiralty jurisdiction, *see, e. g., Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Gutierrez v. Waterman S.S. Co.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943), even this ban on congressional interference with

jurisdiction can relate only to extreme tampering with the territorial or subject matter jurisdiction of admiralty and maritime courts. See *Lucas II, supra* at 445.

█ As the court pointed out in *Lucas II,* Congress might well exceed its constitutional power by bringing within the jurisdiction of an admiralty court a completely land-related accident or transaction; conversely, Congress probably could not "remove from admiralty jurisdiction those types of accidents which occur on navigable water since these are conceptually, traditionally, and constitutionally admiralty matters," *id.* at 445. Short of such egregious meddling, Congress has been given the power to alter

"admiralty law and maritime jurisdiction," was used only rhetorically:

> Although the *Panama* Court uses the phrase "maritime law and admiralty jurisdiction," we suspect the Court intended only to echo the constitutional phrase but inserted the word "law" for a nicer rhetorical balance. The Constitution refers only to "maritime and admiralty Jurisdiction." We cannot attribute to the Court's use of the word "law" the significance which the plaintiffs urge. 387 F.Supp. at 443 n. 8.

**21.** The court in *Lucas II* concisely explained the import of *Panama Ry. Co.* and the line of decisions stemming from it:

> [The language from *Panama Ry. Co.* cited by appellants] is but a short excerpt from a long passage the predominant theme of which is the broad range of congressional discretion to alter and amend maritime law. This pattern, limiting language sounding a minor theme in a case in which the major theme is the wide-ranging congressional power to enact maritime law, is repeated in *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and *Detroit Trust Co. v. The Thomas Barlum,* 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934), two other cases upon which plaintiffs rely. Further, in *Panama Railway Co. v. Johnson* and *Crowell v. Benson,* the Court upheld the federal legislation under constitutional attack, despite thoroughgoing congressional rearrangement of substantive maritime remedies. In *Panama Railway v. Johnson* the Court upheld the constitutionality of the Jones Act, 46 U.S.C. § 688, which conferred on seamen a negligence remedy governed by "all statutes of the United States conferring or regulating the right of action for death in the case of railway employees." In *Crowell v. Benson,* the Court upheld the original Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 901 et seq., which created a federal work-

men's compensation scheme for longshoremen. In fact, except for legislation struck down for undermining the uniformity of maritime law, plaintiffs cannot cite us a single case in which a congressional enactment of substantive maritime law was declared unconstitutional.

Finally, we note that the Supreme Court has explicitly recognized the peculiar appropriateness of the legislative process to striking the correct balance of substantive maritime remedies. In *Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Court held that since Congress had not approved a right of contribution between shipowners and shoreside contractors, the Court could not appropriately do so. In so holding, the Court said:

> We think that legislative consideration and action can best bring about a fair accommodation of the diverse but related interests of these groups. The legislative process is peculiarly adapted to determine which of the many possible solutions to this problem would be most beneficial in the long run. 342 U.S. at 286, 72 S.Ct. at 280; accord *United States v. Atlantic Mutual Insurance Co.,* 343 U.S. 236, 242, 72 S.Ct. 666, 96 L.Ed. 907 (1952).

387 F.Supp. at 444.

This is not to say that congressional control over maritime jurisdiction is narrowly restricted. *See, e. g., Victory Carriers, Inc. v. Law,* 404 U.S. 202, 209–10, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Detroit Trust Co. v. The Thomas Barlum,* 293 U.S. 21, 43–48, 55 S.Ct. 31, 79 L.Ed. 176 (1934); *Dravo Corp. v. Maxin,* 545 F.2d 374, 377–79 & n. 4 (3d Cir. 1976) cert. denied, —— U.S. ——, 97 S.Ct. 2973, 53 L.Ed.2d 1092.

maritime jurisdiction and reformulate substantive rules of liability. And we are of the opinion that section 905(b) represents such a substantive reformulation.

Appellants, though, insist that the abolition of the longshoreman's claim based on unseaworthiness does represent an extreme invasion of admiralty jurisdiction. A breach of the warranty of seaworthiness, they observe, is a maritime tort that may be enforced *in rem* by means of a maritime lien; hence, elimination of the unseaworthiness claim deprives admiralty courts of the *in rem* facet of their jurisdiction.

■ This argument fails for two reasons. First, section 905(b) by its terms quite clearly preserves the injured longshoreman's right to proceed directly against the vessel. *In rem* jurisdiction over the vessel, then, has not been eliminated at all. 1A *Benedict on Admiralty, supra* note 3, at 1–27.

Second, even if the longshoreman's *in rem* suit had been abolished, its abolition still would not represent the extreme sort of jurisdictional tampering we described above. Section 905(b) still would not withdraw from admiralty courts jurisdiction over any particular types of accidents or transactions. Adjudicative power over the rights and liabilities stemming from the longshoreman's injury would still be lodged in admiralty courts. Only the rules governing substantive rights stemming from the transaction would be altered.

In sum, we hold that section 905(b) represents a legitimate exercise of congressional power to alter the substantive law of admiralty. As such, it does not violate the Constitution.

### III.

#### A.

■ Hurst and Minus contend that the court below erred in looking to land-based negligence principles to establish the relevant standard of care under section 905(b). They urge us instead to apply the standard embodied in maritime negligence cases of this court decided before the 1972 amendment of section 905(b), which analyzed the tort on the basis of the shipowner's "nondelegable duty" to provide a safe workplace for longshoremen—a species of liability without fault.[22] Because it seems clear to us that Congress intended land-based principles to apply, we reject appellants' contention.

Section 905(b) does not specify the appropriate standard of care. It refers simply to the "negligence of a vessel." Since the passage of the 1972 amendments, however, this court and other courts have repeatedly commented on the apparent congressional intent to have the courts analyze the standard of care under section 905(b) afresh,[23] and to have them apply land-based principles in the formulation of the new

---

**22.** *See, e. g., Thompson v. Calmar S.S. Corp.,* 331 F.2d 657, 659 (3d Cir.), *cert. denied,* 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964); *Ferrante v. Swedish American Lines,* 331 F.2d 571, 575 (3d Cir.), *cert. denied,* 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964); *Beard v. Ellerman Lines, Ltd.,* 289 F.2d 201, 206 (3d Cir. 1961), *rev'd on other grounds sub nom. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). Indeed, these cases for the most part did not clearly distinguish between negligence and unseaworthiness. *See also* G. Gilmore & C. Black, *supra* note 3, at 384 (unseaworthiness included operating negligence).

**23.** *See, e. g., Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31, 40 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) ("The effect of the first clause of § 905(b) is to create . . . a new negligence third party cause of action against the vessel. . . .); *Burris v. Global Bulk Carriers, Inc.,* 505 F.2d 1173, 1178 (3d Cir. 1974) ("[T]here can be no doubt that [the 1972] amendments rationalize the relative liabilities of shipowners and stevedores by replacing maritime concept of liability with 'a new cause of action for negligence. . . .'"); *Hite v. Maritime Overseas Corp.,* 380 F.Supp. 222 (E.D.Tex.1974) ("It is apparent, from the review of the Senate and House Committee Reports, that it was the intent of Congress to provide longshoremen and ship repairmen with a new cause of action for negligence against a ship owner based upon traditional land-based negligence concepts in lieu of the application of the general maritime law remedies of negligence and unseaworthiness").

standard.[24] Indeed, the section of the House Report that deals with amended section 905(b)[25] could not be clearer:

> The Committee believes that where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured. . . .
>
> The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness," "non-delegable duty", or the like. . .
>
> Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.

It is obvious, then, that the traditional, expansive maritime tort liability is not, despite appellants' contention to the contrary, to be judicially imported into section 905(b) under the guise of "nondelegable duty" or any other synonym for liability without fault.[26] *See, e. g., Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505, 506–07 (2d Cir. 1976); *Bess v. Agromar Line,* 518 F.2d 738, 740–41 (4th Cir. 1975); *Ramirez v. Toko Kaiun K. K.,* 385 F.Supp. 644, 650–52 (N.D.Cal.1974); *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759, 767 (E.D.Pa.1974) (specially convened three-judge panel) *(Lucas I), appeal dismissed,* No. 75–1223 (3d Cir., April 30, 1975), *cert. denied,* 423 U.S. 866, 96 S.Ct. 127, 46 L.Ed.2d 95 (1975). Thus, we hold that the

---

**24.** *See, e. g., Gay v. Ocean Transport & Trading Co.,* 546 F.2d 1233, 1237–38 (5th Cir. 1977); *Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 861–62 (3d Cir. 1976); *Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 762–63 (2d Cir. 1975), *cert. denied sub nom. A/S Arcadia v. Gulf Ins. Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642, *reh. denied,* 424 U.S. 935, 96 S.Ct. 1150, 47 L.Ed.2d 343 (1976); *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 44 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Bess v. Agromar Line,* 518 F.2d 738, 741–42 (4th Cir. 1975); *Burris v. Global Bulk Carriers,* 505 F.2d 1173, 1178 (3d Cir. 1974).

**25.** H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1972), *reprinted in* 3 U.S.Code Cong. & Ad. News, pp. 4698, 4702–04 (1972) [hereinafter cited as House Report].

**26.** Nearly all the commentators are in accord. *See, e. g.,* Robertson, *supra* note 3, at 448–450; Vickery, *Some Impacts of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 41 Ins. Counsel J. 63 (1974).

It is true that Professors Gilmore and Black, in apparent disregard for the legislative history, suggest that § 905(b) ought to be held to incorporate the liberal negligence standards of the Jones Act, 41 Stat. 988 (1920) (codified in scattered sections of 46 U.S.C.). It can only be pointed out that none of the other major commentators agrees. *See, e. g.,* 1A Benedict on Admiralty, *supra* note 3, at 6–10. And of the dozens of cases decided under amended § 905(b), none has applied a Jones Act negligence standard. *See, e. g., Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Bess v. Agromar Line,* 518 F.2d 738 (4th Cir. 1975); *Croshaw v. Koninklijke Nedlloyd,* 398 F.Supp. 1224 (D.C.Or. 1975); *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md.1975); *Ramirez v. Toko Kaiun K.K.,* 385 F.Supp. 644 (N.D.Cal. 1974). *See also* Robertson, *supra* note 3, at 452–55.

district court did not err in looking to land-based negligence principles in formulating the standard of care under section 905(b).

### B.

In seeking simultaneously to apply land-based negligence standards and to maintain the national uniformity mandated by Congress,[27] admiralty courts applying amended section 905(b) generally have turned to the Restatement (Second) of Torts as the national expression of non-maritime tort principles.[28] This court, too, has approved that practice. *Brown, supra*, 545 F.2d at 863.

Appellants urge us to apply Restatement (Second) of Torts § 318 (1965) to the case *sub judice*. Section 318 reads as follows:

### DUTY OF POSSESSOR OF LAND OR CHATTELS TO CONTROL CONDUCT OF LICENSEES

If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so as to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a) knows or has reason to know that he has the ability to control the third person, and

(b) knows or should know of the necessity and opportunity for exercising such control.

Appellants liken the shipowner to a landowner who is allowing a third person—the stevedore—to conduct activities on his land—the ship; the shipowner, by virtue of section 318, would owe a duty of reasonable care to others—the longshoremen—to see that the activity is not carried on in a manner dangerous to them. Specifically, Hurst and Minus contend that the Island Archon's chief officer owed Hurst and Minus a duty to see that the stevedore did not endanger them by using an unsafe hook on the stevedore's crane; since he should have known about the unsafe activity of the stevedore, it follows, say appellants, that he ought to have exercised the ship's ultimate authority and ordered the unsafe method of work halted.

We cannot accept appellants' theory for two reasons.[29] First, and most importantly, the basis of liability under section 318 seems to be precisely that sort of "nondelegable duty" that Congress—as noted above[30]—sought to eliminate by amending section 905(b). Application of section 318 would impose upon the shipowner a duty constantly to oversee the stevedore's methods of operation in order to prevent any dangerous conditions created by the stevedore from threatening the stevedore's own employees or others. Yet Congress quite clearly expressed its intention that shipowners not be held liable "for acts or omissions of stevedores or employees of stevedores . . .; for the manner or method in which stevedores or employees of stevedores . . . perform their work . . .; for gear or equipment of stevedores or employees of stevedores . . . whether used aboard ship or shore . . ., or for other categories of unseaworthiness which have been judicially established."[31] Thus,

27. House Report, *supra* note 25, at 4705; *see, e. g., Anuszewski v. Dynamic Mariners Corp. Panama*, 391 F.Supp. 1143, 1146–47 (D.Md. 1975), *aff'd*, 540 F.2d 757 (4th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

28. *See, e. g., Anuszewski v. Dynamic Mariners Corp.*, 540 F.2d 757 (4th Cir. 1976), *cert. denied* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976); *Teofilovich v. d'Amico Mediterranean/Pacific Line*, 415 F.Supp. 732 (C.D.Cal. 1976); *Croshaw v. Koninklijke Nedlloyd*, 398

F.Supp. 1224 (D.Or.1975); *Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D.Cal.1974).

29. Apart from the two reasons appearing in the text, we note that as far as our research shows, no court attempting to formulate a standard of care under amended section 905(b) has applied section 318 of the Restatement.

30. *See* notes 22–26 *supra* and accompanying text.

31. House Report, *supra* note 25, at 4704–05.

judicial imposition upon shipowners of a duty of control via section 318 of the Restatement would amount to a reestablishment of the "nondelegable" duty that amended section 905(b) was intended to eliminate.

■ Second, section 318 refers to the landowner's duty to control the conduct of *licensees*. Stevedores and their employees cannot be regarded as licensees.[32] If a label had to be affixed to the stevedore's employees, they would be considered invitees.[33] Indeed, with respect to the work they perform for shipowners, stevedores must be classified as independent contractors.[34]

And the employer's duty to control the activities of an independent contractor is governed by a specific topic of the Restatement, sections 409–29. If a landowner's duty to control the activities of an independent contractor fell under section 318, sections 409–29 would be rendered nugatory. Looking to the land-based principles embodied in the Restatement, then, we conclude that section 318 could not have been intended to govern a landowner's—or, by our analogy, a shipowner's—duty with respect to controlling the activities of an Independent Contractor.[35]

**32.** Restatement (Second) of Torts § 330 (1965) defines a licensee as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Comment *a* makes it clear that a licensee is to be distinguished from an invitee, *see* note 33 *infra,* and Comment *h* explains that the term "licensee" comprises three types of persons: (1) social guests, (2) members of the possessor's household, and (3) persons who are on the land solely for their own purposes, in which the possessor has no interest. The stevedore and his employees fit into none of those categories with respect to a shipowner.

**33.** *See, e. g., Ramirez v. Toko Kaiun K.K.,* 385 F.Supp. 644, 651 (N.D.Cal.1974). Restatement (Second) of Torts § 332(1) (1965) describes an invitee as either "a public invitee or a business visitor." § 332 continues:

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a public purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

With respect to a shipowner, a stevedore quite clearly fits into the "business visitor" category of § 332(3).

**34.** *See Teofilovich v. d'Amico Mediterranean Pacific Line,* 415 F.Supp. 732, 739 (D.C.1976); *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092, 1098–99 (D.C.1975). *See generally* Restatement (Second) of Torts § 409, Comment *a* (1965); F. Harper & F. James, *The Law of Torts* § 26.11 (1956); W. Prosser, *The Law of Torts* § 61, at 385–86 (1971).

**35.** Although they do not raise the point on appeal, appellants argued below that Restatement (Second) of Torts §§ 343–43A (1965) applied to the facts in the case *sub judice.* These sections, which according to § 343, Comment *a,* must be read together, provide as follows:

§ 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

§ 343A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

We do not believe these sections are apposite.

Several courts have applied §§ 343–43A to create a duty in the shipowner to warn longshoremen of and protect them from dangers inhering in the ship as turned over to the stevedore. *See, e. g., Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Croshaw v. Koninklijke Nedlloyd,* 398 F.Supp. 1224 (D.Or.1975). It was nothing about the ship or the stowage of its cargo, however, that endangered Hurst and Minus. Instead, it was the method of conducting the stevedoring activity, on a ship otherwise safe when turned over to the stevedore, that resulted in appellants' injuries. If §§ 343–43A were applied to create a duty in the shipowner to

■ We believe that the appropriate section of the Restatement is section 409, which applies to independent contractors and comports with congressional intent:

Except as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.

*Accord*, W. Prosser, The Law of Torts § 71 (4th ed. 1971). We think that this general rule well expresses the congressional concern for the practical operation of the Longshoremen's Act: shipowners "shall not be liable in damages for acts or omissions of stevedores or employees of stevedores . . . ."[36] Therefore, unless one of the recognized exceptions, §§ 410–29, to the general rule that the employer of the contractor has no duty applies, our application of § 409 means that Triad cannot be held liable for the stevedore's unsafe method of operation in this case.[37]

The exceptions stated in sections 416 through 429 of the Restatement

do not rest upon any personal negligence of the employer. They are rules of vica-

apprise himself of, to warn the longshoremen of and to protect them dangerous features of the independent contractor's—i. e., the stevedore's—activity, then the Restatement sections dealing with employer control over the activity of independent contractors, §§ 409–29, would be rendered nugatory with respect to landowners-shipowners. *See, e. g., Anuszewski v. Dynamic Mariners Corp. Panama*, 391 F.Supp. 1143 (D.Md.1975), *aff'd*, 540 F.2d 757 (4th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

Even cases purporting to apply §§ 343–43A to injuries occasioned by the stevedore's activity have generally avoided this result by labeling the dangerous aspect of such activities "obvious" to the longshoremen. *See, e. g., Gay v. Ocean Transport & Trading Co.*, 546 F.2d 1233, 1240 (5th Cir. 1977) (stevedore's improper method of unloading); *Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D.Cal.1974) (same); *Cummings v. "Sidarma" Soc.*, 409 F.Supp. 869 (D.C.1976) (same); *Robertson, supra* note 3, at 473. In a second aspect of *Gay, supra*, the Fifth Circuit held, somewhat contradictorily, that the shipowner has no duty under §§ 343–43A to apprise itself of dangerous activities being carried on by the stevedore, 546 F.2d at 1239. We believe that such evasive readings of §§ 343–43A in fact reflect the approach toward independent contractors embodied in § 409. A more direct approach would be simply to apply the independent contractor sections from the start. *But see Robertson, supra.*

Furthermore, creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of the longshoremen would, as in the case of § 318, *see* notes 31–32 *supra* and accompanying text, saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b). Every shipowner has the authority to oversee stevedoring operations. If that authority, without more, suffices to charge the shipowner with a responsibility for detecting unsafe methods of operations and warning the longshoremen about them, then shipowners will be back in their pre-1972 position.

It is true that the House Report did declare that "nothing in this bill is intended to derogate *from the vessel's responsibility to take* appropriate corrective action where it knows or *should have known* about a dangerous condition." House Report, *supra* note 25, at 4704 (*emphasis added*). The illustration that follows that sentence, however, indicates that this responsibility relates to the condition of the ship itself, not the activities of the stevedore. Indeed, given the congressional concern about eliminating nondelegable duties, the quoted sentence could not possibly have been intended to establish a shipowner's duty to supervise such activities. To the extent that the analysis of *Slaughter v. S. S. Ronde*, 390 F.Supp. 637 (S.D.Ga.1974), *aff'd per curiam*, 509 F.2d 973 (5th Cir. 1975), is to the contrary, we must reject it. *See* 7 Rutgers Camden L.J. 147, 153 (1975).

Finally, §§ 343–43A might not apply at all in the maritime context because of their incorporation to some degree of the doctrine of assumption of risk. *See Brown v. Ivarans Rederi A/S*, 545 F.2d 854–64 n.10 (3d Cir. 1976). Congress has precluded the application of that doctrine in maritime law. *See* House Report, *supra* note 25, at 4705. Thus, it may be that those courts purporting to apply §§ 343–43A— none of which has discussed this issue, so far as our research reveals—were in error. In *Brown, supra*, Judge Van Dusen suggests that the appropriate bases for shipowner negligence with respect to the condition of the ship and cargo may be Restatement §§ 281–83, 302A, 305, and 452. 545 F.2d at 863.

**36.** *See* note 31 *supra* and accompanying text. *See also Henry v. United Overseas Marine Corp.*, Civ.No. 73–1613 (E.D.Pa., March 12, 1976) (unpublished oral opinion), *aff'd mem.* 547 F.2d 1160 (3d Cir., 1977) (expressing fear of "chaos" that might ensue in maritime industry, if concurrent, detailed control of stevedoring operations were imposed on shipowner).

**37.** *But see Marant v. Farrell Lines, Inc.*, 550 F.2d 142, at 145–147 (3d Cir., 1977) (dictum).

rious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer himself has been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant.

The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a "non-delegable duty" requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor to whom the performance of the duty is entrusted.

Restatement (Second) of Torts, Topic 2, Introductory Note at 394 (1965). Clearly, sections 416 through 429 incorporate precisely that concept of nondelegable duty which, as we observed above, Congress sought to eliminate in the relations between shipowner and stevedore. *Brown, supra*, 545 F.2d at 858–61; *accord, Teofilovich v. d'Amico Mediterranean/Pacific Line*, 415 F.Supp. 732 (C.D.Cal.1976). Therefore, the exceptions to the rule of section 409 contained in sections 416 through 429 cannot apply to the case *sub judice*.

Of the remaining exceptions to the general rule of section 409, only one could possibly apply—section 414:

## NEGLIGENCE IN EXERCISING CONTROL RETAINED BY EMPLOYER

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Appellants insist that ultimate control of stevedoring operations rests in the shipowner, since it can at any time order the operation halted. Therefore, they say, the ship-

owner breached its duty of reasonable care to supervise the stevedore's methods of operation and to protect the longshoremen from unsafe aspects of those methods.

■ We cannot agree with appellants' argument. In the first place, using the shipowner's ultimate control in order to create a duty of supervision would amount once again to the establishment of a nondelegable duty. As we have declared above, this is what Congress sought to proscribe by enacting amended section 905(b).

Second, Comment *c* to section 414 indicates that the "ultimate control" over stevedoring operations retained by a shipowner is not the sort of control to which section 414 is directed:

for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. *It is not enough that he has merely a general right to order the work stopped or resumed,* to inspect its progress or to receive reports . . . .. Such a general right is usually reserved to employers, but it does not mean that the contractor is *controlled as to his methods of work, or as to operative detail.*

(Emphasis added.) The court below cogently related the import of Comment *c* to the case at bar:

Thus, as comment "C" points out, an employer who retains only a general right to order that work be stopped or resumed and the right to inspect the progress of work to—let me correct that—to assure compliance with specifications owes no duty of care to the employees of the independent contractor, concerning the manner in which his work is executed. Only when a significant degree of control is retained over the manner in which his work is performed, is the duty under Section 414 triggered for vessel owners.

Here, plaintiff has evidence on the record that the captain of the ship generally has the power to control any activity on board his vessel, but plaintiff's evidence proves no more than that.

Plaintiff's expert is an expert in stevedoring and his knowledge of the authority of ships' officers is very general. There was no testimony as to the specific authority of Chief Mate Caramanlis over the discharge operation and the jury may not on the evidence in this record infer from the fact of the chief mate's observation of the operation that he controlled the operative details of a discharge. Certainly, evidence of such pervasive control could have been adduced by the plaintiffs in the deposition taken of Caramanlis or by some other readily available method.

In sum, we assume that 414 of the Restatement of Torts 2 is part of the federal common law applicable to longshoremen suits against vessel owners under the 1972 amendments. There is insufficient evidence of retained control by the vessel owner in this case to send the case to the jury.

Instead, the general rule applied that the vessel owner owes no duty to protect or to warn the stevedoring company or its employees against dangerous conditions in their equipment arising in the couse [sic] of performing their contractual duties on board the ship.

Brief for Appellants, Appendix at 134a–35a. We agree with the district court's analysis.[38]

Finally, although it dealt with Pennsylvania tort law and Restatement section 318, *Fisher v. United States,* 441 F.2d 1288 (3d Cir. 1971), suggests that this court's understanding of the land-based rules concerning the negligence of independent contractors in no way departs from the explanation of sections 409 and 414 given above. Fisher was injured while in the employ of a subcontractor engaged in work under a contract with the United States on property owned by the United States. The United States exercised control over the contractors' operations even more pervasive than that in the case *sub judice.*[39] Fisher sued the United States under the Federal Tort Claims Act, arguing that the Government was liable for the independent contractor's negligence by reason of that control. The *Fisher* court held otherwise:

[O]ne who employs an independent contractor may also employ a person to ascertain that the work is done according to plans and specifications and that the employment of such a person in no way indicates that the independent contractor is being subjected to control. . . . This is a corollary to the long recognized general right of inspection and supervision that an owner normally enjoys and exercises to ensure his receiving from the contractor the benefit or total performance bargained for.

441 F.2d 1291.

Triad's right to inspect the stevedore's operations and its ultimate authority to halt them, in the interest of contractual compliance, were no greater than—in fact they were not as great as—the Government's in *Fisher.* Indeed, it was appellant's own witness who testified that the shipowner's control over the stevedore was the same as that exercised by the homeowner over someone performing work in his home. That certainly is not the control as to "operative detail" contemplated by section 414.

**38.** In the handful of opinions holding the shipowner liable for injuries suffered as a result of improper stevedoring operations, the shipowner's participation in the operations is clear, direct, and of significant proportions. *See, e. g., Butler v. O/Y Finnlines, Ltd.,* 537 F.2d 1205 (4th Cir. 1976), *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180 (1976) (reversing directed verdict for shipowner where mate, over longshoreman's protest, personally directed particular form of stowage that resulted in injury); *Croshaw v. Koninklijke Nedlloyd,* 398 F.Supp. 1224 (D.Or.1975) (holding shipowner liable where ship's crew performed hatch opening operations involving equipment that injured longshoremen). These cases, then are consistent with our understanding of § 414.

**39.** The Government (1) owned the land on which the project was being constructed; (2) had a general supervisor at the site whose duties included overseeing the Government's safety inspection force at the site; (3) had reason to know of the unsafe practice in question; and (4) required the contractors to follow a safety plan and could require various regulations to be included in the plan.

Thus no exception to the general rule of section 409 applies in this case.[40]

## IV.

In light of the foregoing analysis, we conclude that the district court did not err in directing a verdict for defendant at the close of plaintiffs' evidence. The court rightly concluded that no evidence had been introduced showing that the chief officer in fact knew of the hook's unsafe condition. This left only the question whether he *should have known.* Because the district judge correctly decided that holding the vessel to such a duty of supervision would violate the thrust of amended section 905(b), he properly withdrew the case from the jury. The judgment of the district court will be affirmed in both No. 76–1923 and No. 76–2562.

Costs taxed against the appellants in No. 76–1923. Each party to bear its own costs in No. 76–2562.

---

**40.** *See Vickery, supra* note 26, at 65–66.